The next case today is Bais Yaakov of Spring Valley v. ACT, Inc., Appeal No. 201537. Attorney Bellin, please introduce yourself on the record. Good morning, Your Honor. Eitan Bellin for the Plaintiff Appellant, Bais Yaakov of Spring Valley. Judge Lynch, may I have four minutes for rebuttal? Yes, you may. Thank you very much. May it please the Court. For over 20 years, this Court has held that it is improper to deny class certification based on speculation concerning an affirmative defense that the defendant has. In this case, although the Plaintiff did not have the burden to prove that there was lack of consent, the Plaintiff came forward, first of all, with affirmative evidence that the plaintiff had not obtained prior express permission or invitation to send the faxes at issue to the Plaintiff or any other members of the class, and in fact, they were not even able to obtain such permission. Besides that affirmative class-wide evidence that ACT never obtained prior express invitation or permission to send fax advertisements to the Plaintiff or to anyone in the classes, the defendants also failed to put forward any evidence whatsoever that they obtained such express invitation or permission. Now, the District Court cited a number of what it believed were pieces of evidence that they had obtained such express invitation or permission. I'll just go through them quickly. One of them was thousands of high schools had provided their facsimile numbers to ACT when requesting information about serving as an ACT test center or registering to become an ACT test center. That is not prior express consent to getting a fax advertisement. The second is ACT's records include a fax number from more than 7,000 high schools that have served as ACT test centers and have provided their fax numbers to ACT in other contexts. That too is not prior express consent to be sent fax advertisements. Three, schools contact ACT in a variety of ways, including by telephone, regular email and facsimile, and through an online contact form. Again, that is also not prior express consent to be sent fax advertisements. Fourth, ACT may respond to questions or requests for information from a high school by telephone, regular mail, email or facsimile. Again, not prior express consent to send fax advertisements. Mr. Billin? Yes. They raise an alternative grounds for denying class certification. They say that a large number of the class members are public entities who could not bring a suit through private counsel. I believe that is their argument. Could you just tell me what your response to that is? Our response is a number fold, Your Honor. First of all, the Supreme Court made clear in 2010 that when there is a conflict between Rule 23 and any state law, Rule 23 controls if the state law is not about a substantive state right. Here, the Supreme Court has made clear in Shady Grove that a person can serve as a plaintiff for a class if it satisfies the requirements of Rule 23. The fact that the individual local or state laws may say that the attorney general or the city attorney must be the one to sue, that is not a substantive right, Your Honor. That is a procedural rule which, as Shady Grove makes clear, is controlled by or overruled, I should say, by Rule 23. Also, Your Honors, even if that were not the case, as at least one district court in Massachusetts has ruled, after getting notice, notice to the various governmental entities would be of the class action and giving them an opportunity to opt out is a sufficient way to protect that right. Are you proposing an opt-out or opt-in class or either? It's opt-out, Your Honor. I mean, this is Rule 23, so we would send out at the time that the judge ruled that there was class certification or if the court reversed and said there should be, we would be sending notice out to the class members and they would have an opportunity to opt out. And so, any governmental entity that felt that it did not want to be part of this case could easily opt out in that circumstance. Again, we believe Shady Grove controls, but even if it did not, they could easily opt out and there would be no harm to them whatsoever. That's a very easy thing for them to do. Mr. Bellin, I understood that they were making other defenses as well. I understood that as to the Class B, if we were to agree with the D.C. Circuit decision, then the premise for Class B disappears. As to Class A, the District Court characterized it as a class that depended for its definition on your assertions that the law has been violated, but they don't rest there. They say you, in fact, admitted that in the interlocutory appeal you took and that that issue really has been resolved. In your reply brief, you did not contest that assertion on their part. And then, of course, they've got these various factual defenses. But if you didn't contest the District Court's basic characterization of this as being a disfavored way of pleading class actions, why would we get into these other issues? Your Honor, in terms of Class A being a fail-safe class, we specifically requested in our papers and we've said it in our briefs to the District Court that the District Court, if it believed it was fail-safe... Four minutes remaining. Yes, that's a different argument. I understand that. If it was a fail-safe class, then you say the District Court should have reframed it. But that's a different argument about whether, in essence, you've conceded it was a fail-safe class. I don't think we've conceded that, Your Honor, but we're assuming even if that were the case, the District Court should have changed it and, in fact, the District Court said it would have changed it, but for the fact that it found that there were individual issues regarding consent. So a deficit would... Okay, can I move on? Let's put the class actions aside just for a minute, unless Judge Barron has a question on it. Judge Barron, your microphone is muted. There's some construction outside my location that I wanted to spare you from. I don't know, Judge Lynch, if you were going to start to ask about the status of the D.C. Circuit case and the other cases. Go ahead. Go ahead. So before we get to the substance of that, I just want to understand in what circumstances you think we'd have to reach that question. So let me just work it through this way. You've made a couple arguments to us about the Rule 23 issue. If we were to conclude you were right as to everything you've just said about Rule 23, I take it we'd have to still confront the question of what's the status of the D.C. Circuit? Well, Your Honor, the truth of the matter is that our position is the D.C. Circuit case doesn't control, and there's a case involving a Hobbs Act appeal... I didn't mean to... ...that we can't avoid deciding that issue if we have to get to the question of whether the FCC's interpretation of the no solicited facts rule was valid or not. I'm trying to figure out in what circumstance would we have to reach that question. If we rule for you, if you think you're right on all the Rule 23 issues we just said, we can't avoid addressing the merits of the FCC rule, correct? I believe you do have to avoid it, Your Honor, because there's a current proceeding in the Second Circuit involving ACT and us. This Court doesn't have jurisdiction to rule on that. We have to address either the merits of the FCC rule or the question of whether we have jurisdiction to address the merits of the rule if we rule for you on all the Rule 23 issues, correct? That's correct, Your Honor. Okay, now, suppose we rule for you on some of the Rule 23 issues but not other of the Rule 23 issues. Does a ruling against you on any of the Rule 23 issues potentially render irrelevant the fight over the merits of the FCC rule?  If you were to rule against us on the issue of Class A regarding unsolicited faxes, then the issue is Class B, which contains solicited and unsolicited faxes, where if the regulation is valid, then the individual issues, should you say there were any in Class A, are no longer relevant, because for Class B, the violation is not having the proper opt-out notice. If the regulation is valid, then it applies both in a circumstance where it's solicited and unsolicited. So you really can't avoid it, even if you ruled against us on the unsolicited fax class. That's our position on that, Your Honor. So you know, as to... One last question. There was also this issue about the advertisements? Yes, Your Honor. If we rule against you on the advertisement issue, do we then have to get into the merits of the FCC rule or the jurisdictional questions about whether we can reach the merits of the D.C. Circuit rule? Yes, you do, Your Honor, because the District Court only ruled that there was an issue of fact on the advertisement issue. Our argument is that it's a matter of law. That's time. May I finish the response? Yes, you may. The District Court only ruled that there were issues of fact regarding the advertisement, so at most, it would be upholding the District Court's determination that there were issues of fact, and therefore, you'd still have to reach the issue of the class issues with regard to the FCC's rule. With respect to your Class A, how will the class members be identified? In other words, how will you determine that someone was sent an unsolicited fax? Well, we have in the record, Your Honor, our position is they never got permission. So your Class A, really, you could drop the word unsolicited. In other words, you want included in the class everyone who was sent an advertisement facsimile, such as Exhibit A, to the complaint, and you think there's probably no one in the class then who is subject to an affirmative defense, but if there were, those people can be called out. Well, I think the answer is, I believe you're correct, Your Honor, but the answer is that they have not come forward with a single piece of evidence of prior expressed consent from anybody. That's their burden. So, all we have to do is satisfy the first two requirements, they were sent a fax that has an advertisement. They have to come forward with affirmative evidence. They haven't at all, as we pointed out in our briefs. The one thing I'm a little puzzled by that is, and I understand the point about with respect to the affirmative defense point, but the thing that just puzzles me is certain of the class members don't need the benefit of the FCC rule, but others of those class members do need the benefit of the FCC rule, and that's an unavoidable fact. In that sense, the consent part, in a way, is an element and not just an affirmative defense. Well, that's the reason... In the sense that without the 2006 rule, there's a big chunk of that Class A class who simply couldn't get relief at all. Well, Your Honor, that's why we defied it the way we did. We had Class A's for that very reason. Class A is for people who got unsolicited faxes. Our position is that we don't have the burden of proving that they were unsolicited. They have the burden of showing that they were solicited vis-a-vis Class A. I'm just saying, though, that as long as there are people in a class who are relying on the FCC rule, is there a potential predominance problem in the sense that in order to establish their basis for proving liability, they have to be pointing to the rule. And the only way they can point to that rule is by outing themselves along this dimension of being solicited or unsolicited. So we're sort of back to the same problem. Well, Your Honor, I don't believe that was an issue that was raised. There have been... That was raised below by the court or by the defendant. There have been classes when the solicited fax rule was still considered in effect, there were classes that were certified, and because the idea was it didn't matter, given that the rule existed, it didn't matter whether the fax had been solicited or unsolicited. I think that's something that should be left to the district court. Right, but it might matter to a defendant in litigation if they're trying to defend against liability, to know what's the source of liability. Is it the rule or not the rule? Well, they'll know it after the ruling by the Second Circuit, and if the rule's in effect, they'll know the source of liability is the fact that there's not... The source of liability is that there's no opt-out notice that's satisfactory, Your Honor. But they won't know with respect to any class member whether the reason that particular class member has a claim is because of the rule or not. Well, that wouldn't matter, Your Honor, because if the rule is valid... It might matter if they wanted to take it up on cert.  They can do that, and they can raise that issue, but once it's found... If the Second Circuit says that the rule is valid, and it's denied at cert, that's the end of it. They can't raise it again. They didn't participate in the Second Circuit proceeding, even though they were told about it, and they're bound by that proceeding and any further appeals from that. So there would be no more cert. If the Second Circuit says the rule's invalid, then the rule's invalid. We could probably take it up for cert in the Supreme Court, and it would probably be denied. But that issue will be resolved. How does your Class A work? Let's assume that the SEC rule is invalid, not the SEC rule. Let's assume that the D.C. Circuit is correct, and we agreed with that. Then your Class A, just describe to me how that would work. Class A is all persons who were sent fax advertisements by the defendant, and that's what Class A would be, and the issue of whether there was consent or not is an issue that defendants have to come forward with evidence at the time of class certification. That's what the Ninth Circuit said, and that's what the Sixth Circuit said. We don't have to come forward... to any relief at all. Only the people who received the non-solicited fax. I understand that, Your Honor, but that's not an element of the claim, as this Court held in the Breda case involving texts. It's not an element. But even if it were, we've provided affirmative evidence from the 30B6 witness. Their own corporate witness said that they did not obtain prior express permission or invitation. We're not simply relying on their lack of bringing forth evidence. We have affirmative evidence where they said, we didn't know we had to get consent, and we were not aware of anyone getting consent. They actually... that's affirmative evidence on our side. They have not shown anything to contradict that. Unless my brethren have any further questions, you've got four minutes of rebuttal. I would like just a minute or two on the Second Circuit, this jurisdictional issue, because this seems to be a source of pretty significant controversy among other circuits and the Supreme Court. So, I guess I'm trying to understand the reason you say we are jurisdictionally bound to wait on the Second Circuit's resolution of it. The thing that slightly puzzles me is, why does the Second Circuit get to decide it when the D.C. Circuit has already decided it? And if the Second Circuit can decide it when the D.C. Circuit has already decided it, why can't we also decide it? The answer, Your Honor, is that the Second Circuit, this case, involves a Hobbs Act appeal of a different order. The order that the FCC, that went to the D.C. Circuit, was a 2014 order. This order, the 2020 order, involves my client and ACT. The only way to appeal the decision by the FCC is to go to a Hobbs Act appeal. This Court held that in the Brotherhood case in 1986. We can't appeal directly to this Court about that issue. The only way we can challenge the waiver and the withdrawal of the regulation ... Do you mind us rejecting Justice Kavanaugh's point about pre-enforcement review being the only meaning of the statute? You don't have to reject that, Your Honor, but when there's a Hobbs Act case already proceeding, that's where we have to go.  If that's right, then once you're not in a pre-enforcement review case, and none of these cases are pre-enforcement review cases, none of them are controlling it anyway. There's no exclusive jurisdiction at all. Well, if that's the case, Your Honor, the case has to be remanded to the District Court because it made no independent ruling on the substantive issues. It just said it was controlled. So either way, it should be remanded. Okay, but there's a pretty big difference in what we would be doing on the remand. So do you have a view as to whether the position Justice Kavanaugh sketches out about pre-enforcement review is correct or not? I believe Justice Kavanaugh is correct. The one difference here, though ... Then we shouldn't be waiting on the Second Circuit. But there's one difference here, Your Honor, and that is the proceeding before the Second Circuit is one that will have res judicata effect on these issues between these two parties. When Justice Kavanaugh was talking about this, he was talking about relying on a Hobbs Act decision by one court, not involving the parties in front of the second court. In this case, we have the exact two parties are controlled by the very order that's on appeal to the Second Circuit. So that's why our position is that even though Justice Kavanaugh is right about pre-enforcement review, in this particular case, because both parties are before the Second Circuit, you have to wait for the Second Circuit. That's just a discretionary decision we could make as to whether to wait for something that would have res judicata effect. That's not a jurisdictional point about what we must do. Well, I would say, Your Honor, that's correct. I would say that the Supreme Court has not been faced with this particular circumstance, and this court in Brotherhood said that the only way to appeal a waiver ... I mean, they got a waiver from the Bureau. The only way to appeal that is to appeal that through the Hobbs Act. I'm not sure that this court can rule on the waiver. Maybe it can. If the court decides that, we'll be more than happy to go back to the district court and argue that issue substantively. But either way, we believe there should be a remand. Mr. Bellin, I have a more basic question. It was the rule invalidated by the D.C. Circuit which governed the conduct of the parties at the time we're talking about. The Second Circuit case, you say, is a much more recent rule that actually applied to conduct after the defendants stopped issuing faxes. So why does the Second Circuit case ... why is that relevant to the issues in front of us? It's relevant, Your Honor, because the very order upon which the defendants' ACT relies that granted them a waiver is that very rule that we're appealing to the Second Circuit. And the fact is, as I pointed out in the reply brief, the fact that one court has struck down a regulation doesn't mean that this court is bound by that determination. There are many examples of situations where one Circuit Court says a regulation is valid, another one says that it's invalid. In this particular circumstance, if Your Honor's rule that the District Court had jurisdiction to make a substantive ruling on that question, then the case should be remanded to the District Court to make that substantive ruling. If this court says that, well, because the waiver is at issue and the waiver is at issue in front of the Second Circuit and there's a Hobbs Act appeal, then the court should say, we're going to remand it and say that the District Court has to wait until the Second Circuit rules. But either way, it needs to be remanded. What if we just think, as a matter of law, the statute doesn't authorize the rule, which we agree with the D.C. Circuit? Well, the problem is, Your Honor, that we have not had a chance to brief that issue. It's not an issue that the District Court never decided that. We would ask for supplemental briefing. You've briefed the issue on appeal. I don't think this is a lack of notice issue. Suppose we do agree with the D.C. Circuit. Your Honor, because it's a pure question of law, it does not depend on any facts. Your Honor, because the District Court did not rule on that question, we did not brief that question. So what? If the court wants supplemental briefing on it, we're happy to do it. We briefed it in detail in the Second Circuit brief. I'd be more than happy to submit supplemental briefs, but we'd ask for an opportunity to do that, because really, that issue was not an issue decided by the District Court. All right. We'll look at the record on that. Judge Barron? Yeah. If we rejected the position sketched out in the concurrence by Justice Kavanaugh, and we thought that the exclusive jurisdiction provision was not limited to pre-enforcement review challenges, wouldn't it be the case that it doesn't matter whether the D.C. Circuit – we would be forced to rely on the D.C. Circuit, and we really wouldn't be in a position to assess whether it was right or wrong. Now, I know we could hypothetically just assume that we have jurisdiction to decide it and then conclude that – if we conclude the D.C. Circuit was right. But in the event we had doubts about the D.C. Circuit, the merits of it, we could only get to the merits of the D.C. Circuit's position if we were to conclude that the concurrence Justice Kavanaugh sketched out is wrong. Isn't that right? No, Your Honor, because the only – the rule that they rely on, 28 U.S.C. 2112, is the one that they say renders the D.C. Circuit's decision binding nationwide. There is no inter-circuit stare decisis usually. There is – but it's not – they haven't struck – The point is, if that 60-day clock provision is truly an exclusive jurisdiction provision in the strong sense, and it applies even in the as-applied enforcement context, then we just can't revisit that question, right? The Second Circuit can, Your Honor, because we appealed – we appealed – we did a Hobbs Act appeal within 60 days of the second order. That's what I'm saying. There is a – there's a proper appeal there. And so even though you can't – even if you felt that way, the Second Circuit does have jurisdiction. The FCC has not contested that. You can look at the papers in the Second Circuit. They admit that there's jurisdiction there. While we wait for the Second Circuit, what are we supposed to do if we've got two decisions within the 60-day period that are conflicting, and we're outside the 60-day period? What are we supposed to do then? Well, in this particular case, it'll be simpler because once the Second Circuit decides, the ACT and us and the plaintiffs will be bound by res judicata, by res judicata. So it's not – that's not a problem here. It's not like you've got a second case that doesn't involve these parties. They'll be bound – we will all be bound by that. So you don't have to worry about that, Your Honor. All right. I think we can move on, and you still have your rebuttal time. Thank you, Your Honor. Thank you, Mr. Bellin. Please mute your audio and your video, and Attorney Burgoyne, please introduce yourself on the record. Good morning, Your Honors. Robert Burgoyne from Perkins Coie on behalf of Appalee ACT. ACT's position here is fairly straightforward. After eight years of litigation, Judge Hillman correctly decided that the litigation should end. He didn't abuse his discretion in denying class certification based on a lack of predominance. He correctly denied Bias Yakov's motion for summary judgment on its remaining individual TCPA claims, and he correctly concluded that after ACT paid Bias Yakov all the money it requested and also took additional steps, the case was moved. Addressing first Bias Yakov's discussion and your discussion of the significance of the D.C. Circuit, we believe that other courts of appeals which have held they were bound by that decision got it right and that they correctly interpreted the Hobbs Act to reach that conclusion. I also think, however, Your Honor, that you get to the same place as was suggested if this court simply agrees with the analysis in the D.C. Circuit and concludes independently as I believe the Third Circuit did in the Cephalon case that the D.C. Circuit was correct in its analysis, and you get to the same place ultimately on the significance of the consent issue by virtue of the fact that ACT obtained a waiver from the Federal Communications Commission as to any liability for these faxes or faxes sent prior to 2015, and then, of course, you get there again if you look at the fact that the FCC has now removed the regulation, the Solicited Fax Rule, from the Federal for the Code of Federal Regulations. As the FCC said in its March 2020 order, that order put an end to any confusion regarding the applicability of the Solicited Fax Rule in all jurisdictions on a nationwide basis, so we think that the Solicited Fax Rule is no longer valid, which then feeds into and controls the analysis regarding predominance. I should also note on this question of whether Baez-Yakov versus FCC controls. Counsel, Judge Barron has a question. The one thing I think you didn't address in that summation was the Second Circuit decision. Is it true the Second Circuit decision is concerning the same FCC rule and is an action that was within that 60-day period? The FCC, the Second Circuit case is addressing the March 2020 FCC ruling, which was the one which removed, affirmed the Bureau's removal of the Solicited Fax Rule from the Code of Federal Regulations and also dismissed as moot Baez-Yakov's appeal from the waiver that ACT received from the Bureau. So it is, my understanding is that it was within 60 days of that order, but that order also indicated that, made clear that the appeal in the Baez-Yakov versus FCC case was binding across the country. And ultimately, it was a question of the rule being invalid, not just an FCC order. I guess I didn't understand your answer. What I really wanted to know was the other, your opponent just suggested to us that we should be waiting for the Second Circuit's ruling. There is a chance the Second Circuit, he was suggesting, I think, would come out on the merits of the issue decided by the D.C. Circuit differently than the D.C. Circuit did, and that there'd be res judicata effect on that question. Is that, if that were true, then the decision to wait for it could be quite consequential rather than just applying the D.C. Circuit opinion. What's your view on that contention? Yes. I don't believe that the Second Circuit will be able to rule that the solicited facts rule is valid. I don't believe that it can make that determination regardless of, in the context of reviewing the March 2020 order. Okay. But would its ruling, however it comes out, whether it can get to the merits of the issue the D.C. Circuit decided or not, would its ruling, if it was adverse to your opponent, be binding here and therefore favorable to you and any need for us to figure out whether the D.C. Circuit had it right? That's on the one hand. Alternatively, if the Second Circuit comes out the other way, is there a way it could come out that would be favorable to your opponent, but also in a way that would make the question of whether the D.C. Circuit had it right irrelevant for this litigation? Well, one way is the issue before the court was whether a mootness finding by one of the issues presumably before the Second Circuit is whether the mootness finding regarding the waiver rulings was appropriate. Presumably that issue would need to get remanded to the agency in order for the agency to decide, the full commission to decide, whether or not, in fact, the waivers were warranted. The second issue in that case, of course, is the merits of the solicited facts rule. And I don't, if that is upheld and then we have a conflict between the Second Circuit and the D.C. Circuit, then Mr. Bellin may well be right. That's an issue that will presumably get sorted out. I guess what I'm saying is if there is a pending Second Circuit litigation that has the potential to be determinative of the outcome in this litigation because of the res judicata consequences, why doesn't it make sense for us just to wait since that's already done? Yeah, I don't think it is going to be, I don't think there will be res judicata consequences here. I mean, in truth, the question is, why is Bayez Yakov in a permission, in a position to permissibly be relitigating the question of the validity of the solicited facts rule, having already litigated that issue and lost in the D.C. Circuit? Why is it that we're in a position where it is litigating that issue in the in the Second Circuit? My question is, if it already is doing that, why also have it litigated in the First Circuit too if the Second Circuit's going to just be determinative of what we do? As long as there's a potential for that, why doesn't it make sense for us just to wait, see what happens in the Second Circuit? If it is determinative of the issues here, then it is. If it's not, then it's not, but otherwise you've got potentially now parallel litigations in the First and the Second, each of which is sort of about whether the D.C. Circuit controls. It seems a little bit unnecessary. Well, even if the Second Circuit were to hold that the solicited facts rule is valid, that doesn't overcome the problem of the waiver that ACT received from the FCC. I was going to get there. If they uphold the mootness determination, don't they lose? And is that worth waiting for regardless of whether the issue of the underlying validity of the rule is reached? I can see that the Second Circuit might say we don't actually need to reach the underlying validity because the issue before us is not that. It is the withdrawal of the rule, the affirmance of the agency withdrawal of the rule. So I can see that there is a very good reason not to wait, assuming there will be some conflict. But as to the mootness point, there may possibly be a reason to wait because if the waiver is valid and renders moot their claims, aren't you totally protected? We would be totally protected in that case by virtue of the waiver. And the consequences still flow from the District Court's subsequent analysis. OK. And are there ways that the Second Circuit would not address that issue as part of addressing the question of the validity of the repeal, if you will, of the rule? Well, presumably if the Second Circuit concludes that the either that it will not revisit the validity of the five minutes remaining, it will not revisit the validity of the solicited facts rule because it disagrees with Bass Yakov's position regarding the Hobbs Act or it concludes independently that agrees with the D.C. Circuit that the rule is invalid, it may never reach. It would not in that event need to reach the waiver question, the mootness question. But on both of those outcomes, that's also quite favorable to you and would affect pretty significantly what we do. Both of those, if the Second Circuit were to disagree with Bass Yakov on both points, that is certainly favorable here. Yeah, so I guess that's the position in the case. I understand why you might not want to take a one in four chance of having us wait for the Second Circuit, but what's a good reason for us not to take a three and four chance that the Second Circuit will do something that saves us a lot of work? Well, Your Honor, I don't disagree with that. And of course, there's the separate issue about whether it's the truth is if if Bias Yakov doesn't have any claims against ACT, you don't even need to get into the class certification. All right. I admire my colleague's ability to calculate the odds so quickly. When was has the has oral argument been held in the Second Circuit? And what is a prediction on how long it will be before there is a decision by that court? Yes. Yes, Your Honor. Oral argument in that case is scheduled for February 2nd. I can't predict, but, you know, I roughly sketched out March to July, perhaps for a decision potential for Supreme Court review after that six plus months. We then come back to this court or act and Bias Yakov return to the district court in 2022. Maybe we're back here in 2022 or 2023. But now let me ask it this way, though, just as if we wait for the Second Circuit, their decisions will be binding on us. Is it symmetrically true that what we do will bind them? That's an interesting question. You've got Bias Yakov would likely. Well, I don't know the answer to that because we are not a party to the Second Circuit decision. We had no reason to join that, although, you know, again, the point I was making earlier, I do think that as a matter of non-mutual collateral estoppel, Bias Yakov should not be litigating the issue anywhere else, having lost in the D.C. Circuit. But as to whether or not a decision by this court would would preclude a contrary ruling by the Second Circuit, frankly, I haven't given that question enough thought to to provide an informed answer. I have a question as to individual relief, putting aside the class issues. They say, look, we rejected the tender of the amount of damages under the statute. And under normal First Circuit rules, that means the case isn't moot. So what's your reply to that? I think we we can look for some guidance there to the Supreme Court's decision in Copper Yule, where the four justices would have held that actual payment of the full amount was sufficient to to lead to mootness on the issue of the monetary claim. And then we also pointed to district court decisions in Massachusetts, where courts have held that you can't simply refuse to take an actual payment. And also noted in the prior appeal in this case, we might well have a different issue on the subject of monetary relief. Had ACT tendered a bank check as opposed to simply making an offer of judgment? That was in the prior decision in this case. I'm not aware of any First Circuit case squarely holding that a party can simply reject payment and and keep litigating when it's gotten the full amount of monetary payment that it claims to be entitled to. OK. On the class certification issue, with reference to their alternative Class A, that they argue should have been adopted by the by the district court in the wake of its failsafe determination. As I understand your brief, a principal argument for rejecting certification of Class A is predominance. And you've made several issues. One is the capacity to hire attorneys for these public entities, which we heard a response to. But the particular one that seems to caught the attention of the district court was that there would need to be factual determinations as to whether or not someone actually gave expressed prior consent. And our law and the law of other circuits makes clear that if you if we are to pay attention to something like that, but the mere theoretical possibility of it isn't enough. In In re Asikal, what we were confronted was was a concession that there was seven to 10 percent of the class and you couldn't tell who. So far, I haven't seen in this record any example, any proof that there is, in fact, anyone in this class who gave express prior consent. If we construe that as something that is truly express and consent that came before the advertisement was sent, am I misreading the record? I see statements saying we would have done this or it would have been, but I don't see any evidence that there are any significant number of class members who couldn't be identified, who gave express prior consent. Your Honor, we think the Third Circuit's analysis is correct and that if someone gives you a fax number and authorizes you to communicate with them regarding the subject matter for which they gave you the fax number, that is both express and it is prior. And that's so long as the communication, subsequent communication relates to that subject matter, you've met the requirements of the the TCPA. Sure, but that has to be permission to send an advertisement, not just to communicate with. Well, the only their basis for the argument on the advertisement was pointing to a 2003, I believe, FCC discussion of that issue. But if you look at that, the FCC in that particular order was actually discussing a rule which it was adopting at the time, which has subsequently been removed. And other courts have not found that language to lead to the conclusion that you have to use the magic word advertisement or that you can't get it by simply providing a fax number. Let me stay with this for just a second. Let's make a point regarding the Third Circuit. Let's just assume for purposes of argument that express prior authorization permission required that it be express and that it refer to permission to send an advertisement. That you couldn't infer it from someone just giving you a number and asking for information. Is there any evidence that there is any substantial number of class members who couldn't be manageably identified who would fall into that category? Well, we of course, we point initially to Bias Yakov as record evidence of someone who gave prior express permission to be sent a fax. And in our view, if they're right that these are advertisements, then it gave us consent to send a fax advertisement. Ultimately, your honor, there's going to be a problem identifying who would be an appropriate class member, because all we have is a series of random fax logs as to which there's no evidence regarding their significance. If you look at those fax logs, there's nothing. You can go on with that, but I'd like you to answer my question first. Have you yet out of this entire class of more than thousands of people and your client was a client that sent the fax, have you offered any evidence that a single one of those putative class members, in fact, gave the type of express prior consent that the more rigorous type that we're assuming might be applicable? I don't know of any evidence in the record which indicates that a high school said to ACT, you have my permission to send me fax advertisements. I don't think that I mean, ultimately, it gets circular bias. Yakov says anything that discusses the ACT exam is is an advertisement. But everything we send out discusses virtually everything we send out discusses the ACT exam, and they concede we had permission to send faxes relating to the either to give them ACT scores or to other ACT test related publications. Yes. So so there would be an issue then with regard to Exhibit A to the complaint, which is incorporated in the class definition. And if Exhibit A is not an advertisement, that isn't a predominance problem. That's a you win as to the whole class issue. Correct. If the court were to conclude either of those faxes is not an advertisement, then as to those faxes, we win and class certification or predominance isn't an issue. In fact, you'd like to have a class in that situation. Well, it might. But frankly, a ruling on that raises an additional issue. If one of these faxes isn't an ad and the other one is, how does any given school prove which fax it received? And so we've got to have additional trials on those issues. And they also define the class in terms of who was sent a fax. You didn't receive the fax, then they didn't suffer an injury. Now, you've raised a separate issue that isn't so much. And now you're talking not about predominance, but you're talking about the ability to identify class members, which is also required. Are you saying there's no way to identify who was sent Exhibit A to the complaint? Well, there's two. Exhibit A has three faxes in it. And we would question whether or not there will be any way to identify who was sent a specific fax. If you look in the record, Bias-Yakoff refers to several pages as so-called ACT fax logs, when in fact, a good percentage of those aren't fax logs at all. They're just a list of schools with fax numbers. And then if you look at the fax numbers or the actual fax logs, they don't tell you which fax, what fax was sent, which given entry relates to a fax, or even if it was a fax versus a phone number. They don't tell you which fax went through. And only if a fax went through, could there actually be injury. Do we have any fact findings on this below? Because I don't recall this being litigated. The identification issue. The court did not reach the ascertainability or identification issues, but it would certainly be an independent grounds for the court to have denied class certification. I apologize to my colleagues for taking up so much time. I just wanted to tie up one loose end from the conversation that you just had with Judge Kayada. I thought there was a separate dispute between the parties, independent of whether it's an advertisement or not. There is a separate dispute. If I understand your conversation with Judge Kayada, you're suggesting that in the predominance discussion, you've now flipped positions. In order, you're taking the opposite position with respect to whether it's an advertisement when you're arguing about predominance, than you are about whether it's an advertisement when you're not talking about predominance. Am I right on that? I certainly didn't intend to do that. Well, I thought you were saying to Judge Kayada that it was an advertisement. For purposes of the predominance. No, no, no. Our position is that neither facts is an advertisement. OK. I think what you're referring to is my observation that if Bias Yakov is correct, that this is an advertisement because it referenced the ACT exam, then we had pointed to testimony. No, but what I was saying, you were saying that the consent existed because by consenting to the communication, they consented to an advertisement. Well, that would be the conclusion. That only makes sense if everything ACT sends, that plausibly they would send, is an advertisement. No, again, Your Honor, I apologize. I was saying that if Bias Yakov is correct, and we disagree that it is, that either of these documents were facts, were advertisements, then it's if the head of the school testified in another case that Bias Yakov is pursuing against the Educational Testing Service, that, yes, he agreed that when they gave their fax number to ETS, ETS had permission to send them faxes relating to the SAT exam. I thought you were. If they're all faxes, the inference that you want us to infer consent as sufficient becomes stronger because everything they're talking about would be advertisements. Well, everything as they characterize it would be advertisements. But we believe these aren't advertisements. We think these were informational communications sent to institutions with longstanding relationships. If we accept that view, then I guess that's just helpful to you anyway. But the predominance point you were just making then goes away, doesn't it? I think there's still the predominance issue. If you were to conclude that they are not advertisements, then you still have the question that you raised earlier about what if a strict interpretation of prior express permission applies? Yes, but we don't have the other point about whether the consent was satisfied. Yeah, that's all I was saying. OK, I got it. OK, thank you. Thank you. We'll hear rebuttal now. Thank you, Mr. Burgoyne. You can please mute your audio and your video. And at this time, would Attorney Bellen please reintroduce himself on the record? Good morning, your honors. First, I want to address the issue of an advertisement. The district court found that there was an issue of fact as to whether they were advertisements. Our position was that they clearly were advertisements as a matter of law. They advertised the dates of the ACT tests. They told the schools to encourage their students to take the ACT tests. The record is clear that the reason that the ACT sent out these faxes was to increase the number of people who take the ACT tests and to increase the revenue that ACT made. I think actually that the district court, as a matter of law, was wrong to say there was issue of fact. There is no issue of fact. We believe as a matter of law, these are advertisements. If you're right on that, what does that do to the predominance discussion? Doesn't that increase the inference that there was consent for at least some number of people? No, it doesn't. I don't think so, your honor, because we never consented to get faxed advertisements. This is the key citing to ETA. He's citing to another case involving another defendant to say that we gave consent here. That case also that was not consent. And even the district judge in that case, as we cited in our brief, in a published opinion, said that it was not consent to get faxed advertisements. That was just to maintain a class. You need a rather robust ruling on express prior authorization for an advertisement. You need us to rule that merely receiving ads and not complaining about it and looking forward to them is not express prior. That's correct, your honor. I don't think it's a very difficult conclusion to come to. The word express means express. If it meant implied consent, it would have just said prior consent. The Supreme Court, and we've discussed this in other cases, Supreme Court has made clear the differences between consent simpliciter, which includes implied consent, and express consent express. So you're asking us to reject the Third Circuit approach. That's correct, your honor. The Third Circuit was clearly wrong because it's inconsistent with the structure of the statute. They said that just giving a fax number is enough to be to infer consent to get faxed advertisements. But giving the fax number is only one of three required elements of a defense to get to the defense to getting an unsolicited fax. If that alone were enough, then that makes the other two elements irrelevant. And that's not something that this court can do. It can't read out those other two elements. Has the FCC weighed in one way or the other on this issue? On which issue, your honor? I'm sorry. What is what is what is express consent? Yes, they have. I mean, the 2005 order, 2003 order, the 1995 order. They say it has to be prior express consent to get faxed advertisements, not just giving over your number is not sufficient. Just weren't those weren't those revoked? No, they were not, your honor. Those those two rulings were not revoked in the D.C. I'm sorry. And the the Seventh Circuit in the physician health source case from 2020 specifically cites those and specifically says you have to get explicit permission to send ongoing fax advertisements. That's what the Seventh Circuit said. They're absolutely correct. Yeah, but just last one, did the FCC take a view on the Third Circuit's position specifically? No, your honor, the Third Circuit's position came out in 2019. FCC has not has not specifically addressed that case, but it has addressed that issue in prior rulings. And the Third Circuit just ignored those and came as a dissent as the dissent pointed out. It was a split decision that Judge Porter pointed out all the flaws in the majority's majority decision in Cephalon. The other thing, your honor, is this question of whether the executive is somehow barred by some sort of non-mutual collateral estoppel is completely wrong. First of all, that was not raised by any of the parties here. Second of all, even the FCC has not raised it in the Second Circuit. And third of all, it's invalid because there is no non-mutual collateral estoppel on pure issues of law. And that's what the case law says. There are cases in the D.C. Circuit, cases in the Seventh Circuit. It's a pure issue of law and there is no non-mutual collateral estoppel. And that's why the FCC has not raised that as a defense in the Second Circuit. And I'd say that's the reason why the defendant here doesn't raise it. That's time. Thank you very much, your honors. And thank you both. That concludes argument in this case. Attorney Bellin and Attorney Burgoyne, you should disconnect from the hearing at this time.